[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 136 
Does a complaint state a valid claim in tort where it alleges:
 (1) the defendant, as manufacturer, proximately caused the plaintiff's intestate's death by selling a product in a defective condition which was unreasonably dangerous to him as its ultimate user;
 (2) the defendant was engaged in the business of selling such product; and
 (3) it was expected to, and did, reach the user without substantial change in the condition in which it was sold?
The answer is "Yes." The order of dismissal of Count 7, which substantially averred the elements set out above, is reversed and this cause is remanded for further proceedings in accordance with this opinion.[1] *Page 137 
 FACTS
This appeal tests only the validity of the trial Court's ruling on the pleadings. There was no trial. The only "facts" are those contained in the plaintiff's complaint which are summarized as follows:
James Samalone Atkins was operating a 1970 Gremlin automobile in Huntsville on December 6, 1974, when a Lincoln Continental driven by Roland Dean Brown, struck him from the rear. The impact caused the passenger compartment of Atkin's vehicle to fill with burning gasoline and Atkins suffered severe burns from which he died several hours later.
In summary, plaintiff's complaint, averring the foregoing facts and elements of tort liability, contends that American Motors' product was defective in manufacture and design in that the gas tank was located in such a manner as to be immediately and directly available to penetration and puncture, and the shell and bumper were both inadequate to provide any protection to the gasoline tank from an external force.
 PRELIMINARY OBSERVATIONS
Our holding rejects the adoption of the pure strict tort liability theory urged by the plaintiff-appellant. On the other hand, it is not an adherence to the traditional negligence theory of tort liability urged by the defendant-appellee. Therefore, we deem it appropriate to preface our analyses and conclusions with certain initial observations.
The approval of the complaint containing essentially the language of the Restatement of Torts 2d, § 402A, is not the equivalent of adoption in toto of the Restatement's concept of strict tort liability in products liability cases. We hold that a complaint substantially following the Restatement's elements of liability will withstand a motion to dismiss. Otherwise stated, "negligence" is not an essential averment in the statement of a claim.[2] Contrary to plaintiff's "economic" or "social" theory of recovery, however, we retain the "fault" concept based on a standard of conduct causally related in fact to the defective condition of the unreasonably dangerous or unsafe product. As we shall later develop, the practical distinction, then, between our holding and the Restatement is that our holding will allow certain affirmative defenses not recognized by the Restatement's no-fault concept of liability.
 HISTORICAL BACKGROUND
Strict tort liability in the area of products liability law arose to overcome two obstacles to consumers' recovery against suppliers of defective chattels. These obstacles were (1) the intricacies of the law of sales (such as privity, disclaimer of warranty, and notice of breach) which thwarted consumer recovery under the theory of warranty, and (2) the difficulty of proving standards of care and negligence within the complex manufacturing system which brings most consumer goods to the market place. The history of the development of products liability law reflects society's attempt to balance its need for industrial expansion with the desire to protect the consuming public from unreasonably dangerous products.
The first landmark case in the field is Winterbottom v.Wright, 10 M. W. 109, 152 Eng.Rep. 402 (1842), which imposed the privity requirement of contract law upon a negligence cause of action to protect the emerging industrial revolution from the "most absurd and outrageous consequences" of an avalanche of tort actions *Page 138 
against negligent manufacturers. For nearly 75 years afterWinterbottom, the privity requirement in negligence cases was attacked and weakened with exceptions for "imminently" and "inherently" dangerous products until finally in MacPherson v.Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916), the exceptions had consumed the rule, and the privity requirement was abandoned in negligence based products liability cases. While MacPherson was a major advance in consumer protection, the second obstacle to recovery — the difficulty of proving a manufacturer's lack of due care — still plagued plaintiffs. The only course available to injured consumers who could not meet the negligence burden of proof was the theory of implied warranty, but the warranty theory was encumbered with the traditional contract requirements and defenses such as privity.
This obstacle to warranty recovery prevailed until 1960 whenHenningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69
(1960), held both the manufacturer and the retailer of the defective automobile liable for personal injury on an implied warranty theory without the necessity of privity of contract. After the Henningsen case, all that was required to establish strict tort liability in products liability law was to abandon the old warranty nomenclature and define the elements of the new tort. These final steps were taken by the American Law Institute in § 402A of the Second Restatement of Torts, and were first followed by Justice Traynor, speaking for the California Court in the celebrated case of Greenman v. YubaPower Products, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897
(1962). Greenman, although the plaintiff's only statement of claim was breach of warranty, dismisses warranty terminology, saying that the progression of case law in the area of products liability makes "clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort."
Justice Traynor then defines the new tort action:
 "To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for its intended use."
With § 402A of the Restatement and the Greenman opinion, both obstacles to consumer recovery for personal injuries in products liability cases were overcome. The obstacle of privity and contractual defenses was banished by changing the nature of the cause of action from contract to tort, and the obstacle of proving lack of due care was eliminated from the new tort action by removing the requirement that the product's defect resulted from the seller's negligence. Since Greenman, the concept of strict liability in tort has been accepted and applied in more than thirty states. "The transition from industrial revolution to a settled industrial society"[3] was complete.
 RESTATEMENT'S NO-FAULT CONCEPT
While many may applaud the efforts of these courts to make the law more viable and responsive to the realities of modern society, in retrospect, our analysis of this progression causes us to take exception to two fundamental aspects of the Restatement's concept of strict liability:
 (1) the no-fault precept which imposes liability equally on all "sellers" without regard to culpability causally related in fact to the defective condition of the product, and
 (2) the practical abolition of the distinction between the remedies of tort and contract. *Page 139 
In reply to defendant's insistence that tort law must retain the moral culpability concept, the plaintiff urges that moral culpability is a vital and fundamental element of a cause of action in strict tort liability. The moral wrongdoing, says the plaintiff, lies in the distribution of an unreasonably dangerous product which exposes members of society to an unreasonable risk of harm.
This puts the test of culpability in the quality of the product rather than in a standard of conduct resulting in the quality of the product; and it fails to distinguish between one whose conduct has contributed to its defective condition and one whose conduct has not so contributed. Indeed, candor requires a forthright admission that culpability in the traditional sense is lacking and any justification of the new tort theory must be founded on broader moral notions of consumer protection and on economic and social grounds, placing the burden to compensate for loss incurred by defective products on the one best able to prevent the distribution of those products.
For example, to hold liable in tort a retailer of a packaged product, purchased from a reputable manufacturer without knowledge of its unsafe condition, for the mere selling of a defective product is to fully equate for liability purposes a tort remedy with a breach of warranty remedy, the effect of which is to destroy the distinction between the two. We reject this concept.
To be sure, a close analysis of the Restatement, and its exhaustive Comment to § 402A, makes clear that its drafters have no quarrel with those who denominate the Restatement's concept as breach of warranty rather than tort. So, strict liability of the Restatement variety is not tort in the traditional sense; rather, the Restatement fashioned a new cause of action which is more properly titled by its own text, "STRICT LIABILITY — Special Liability of Seller of Product for Physical Harm to User or Consumer."
Incidentally, as we have observed, the California Court inGreenman followed the Restatement's concept of liability in the context of a claim for breach of warranty. We are unfamiliar with the distinction between remedies available under the law of California; but our system of remedies and the doctrine of election of remedies is far too ingrained in the jurisprudence of this State to be here rejected and overthrown in the absence of more compelling reasons.
 DEFECTIVE PRODUCT AS NEGLIGENCE PER SE
Because our holding rejects the no-fault strict liability concept of the Restatement, we deem it appropriate to reemphasize that our retention of the fault concept is to be treated in the context of a defective condition, which renders the product unreasonably dangerous or unsafe when put to its intended use, rather than in the context of traditional notions of negligence law.
The gravamen of the action is not that the defendant failed to exercise due care in the manufacture, design, sale or placing in the commercial stream a defective product; rather, the gravamen of the action is that the defendant manufactured or designed or sold a defective product which, because of its unreasonably unsafe condition, injured the plaintiff or damaged his property when such product, substantially unaltered, was put to its intended use.
Vital to the fault concept, of course, are the allowable defenses which are discussed in a later section of this opinion. We re-emphasize at the outset, however, that, given the allegation and proof of injury resulting proximately from the product's defective condition, the defendant may not avail himself of proof that he exercised due care in the manufacture and sale of the product. Subject to the allowable defenses, the care with which *Page 140 
a defective product is manufactured and sold is immaterial.
Before closing our discussion under this section of the opinion, we hasten to ease the minds of those who may feel that our holding here is a radical departure from established case law. It is not. A few observations respecting our cases dealing with manufacturer's liability will demonstrate that this "fault based defective product" theory should not be viewed as either radical or novel to established precedents in our jurisdiction.
This Court has frequently treated the defective condition of the product as the basis of a cause of action although negligence was charged. Ford Motor Co. v. Thomas, 285 Ala. 214,231 So.2d 88 (1970); Norton v. Harrelson, 278 Ala. 85,176 So.2d 18 (1965); Sears Roebuck Co. v. Morris, 273 Ala. 218,136 So.2d 883 (1961). And see the concurring opinion of Justice Maddox in Geohagan v. General Motors Corp., 291 Ala. 167,279 So.2d 436 (1973). These cases indicate a recognition by this Court that a plaintiff has an almost impossible burden of meeting the due care test required in traditional negligence cases. We believe this burden, however, can be lightened without abandoning the philosophy of a long line of cases and short of adopting the so-called doctrine of strict liability in tort. A mere extension of the holding of those prior cases leads us to conclude that selling a dangerously unsafe chattel is negligence within itself.
It is important to understand that we are not saying (by the use of the term "negligence within itself") that the proof of a defective condition, which renders the product unreasonably dangerous, is evidence or circumstances from which the jury may infer negligence. The doctrine of res ipsa loquitur is not here applicable since it is an evidentiary principle within the traditional law of negligence.
As Dean Wade has observed:
 "In essence, strict liability in this sense is not different from negligence per se. Selling a dangerously unsafe product is the equivalent of negligence regardless of the defendant's conduct in letting it become unsafe . . . selling a dangerously unsafe chattel is negligence within itself." Wade, Strict Tort Liability of Manufacturers, 19 S.W.L.J. 5, 14 (1965).
This amounts to no more than saying in traditional language that a defendant is liable if he puts on the market a product which is not reasonably safe, and the plaintiff is injured as a result of a contemplated use of that product.
By this rule, we do not abandon the fault concept as has been done in some jurisdictions. By holding that selling a dangerously unsafe product is negligence per se, we are not adopting a "no-fault" concept. The fault of the manfacturer, or retailer, is that he has conducted himself unreasonably in placing a product on the market which will cause harm when used according to its intended purpose. The manufacturer, or retailer, is held liable because he has created an unreasonable risk of harm.
The historical and traditional purpose of tort law has been to protect individuals against such risks. The only real difference between strict tort liability and the traditional negligence theory in products liability cases is that those courts which have adopted the rule of strict liability look to the dangerous characteristics of the end product, rather than the methods or processes by which it was produced. This represents a shift in emphasis from the manufacturer's or retailer's, conduct to the performance of his product. While the results may be the same when applied to the liability of any given defendant — meaning simply a defendant must pay the consequences of placing an unreasonably dangerous *Page 141 
product on the market — it does not preclude a defendant from asserting as a defense against such claims the lack of any causal relationship between his conduct and the defective condition of the product.
Liability, subject to allowable defenses, attaches solely because the defendant has exposed expected users of a product not reasonably safe to unreasonable risks. When this is shown, scienter is supplied as a matter of law. In the words of Dean Wade: "[I]t is negligence to sell a product which lacks the attribute of due safety." Wade, "Strict Tort Liability," 44 Miss.L.J. 835. This is morally and legally correct.
To establish liability:
 (1) A plaintiff must prove he suffered injury or damages to himself or his property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
 (a) the seller was engaged in the business of selling such a product, and
 (b) it was expected to, and did, reach the user or consumer without substantial change in the condition in which it was sold.
 (2) Having established the above elements, the plaintiff has proved a prima facie case although
 (a) the seller had exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer had not bought the product from, or entered into any contractual relation with, the seller.
American Motors argues that the public policy of Alabama is that negligence is the basis of liability in products liability litigation. We agree. To base liability on anything else would be in violation of long-established principles. A number of cases are cited for the proposition that manufacturers', or retailers', liability has been based on negligence. We adhere to this proposition. We simply hold that selling a dangerously unsafe product is negligence as a matter of law. We do not believe that adopting this rule conflicts with the public policy of this State. Changes to the proposed Uniform Commercial Code by the Alabama Legislature enlarged the concept of privity, in extending the seller's warranty to any natural person who might be expected to use, consume, or be affected by the goods. American Motors argues that these changes were not meant to imply the adoption of strict tort liability. We agree; but it is an indication of the legislature's recognition that the old privity shield against liability was no longer to be tolerated in this State.
American Motors also argues that the leading case ofGreenman, and its progeny, the Restatement of Torts 2d, § 402A; the Comment to it; and the writings of Dean Prosser, Dean Wade, Kenneth B. Wright, and other legal scholars are not binding authority on the courts of Alabama. We agree that such authorities are not binding on us. Furthermore, it is contended that the conclusion of some of these scholars that Alabama has adopted strict tort liability by statute is to be given no weight. See Prosser, The Fall of the Citadel, 50 Minn.L.Rev. 791 (1966).
Whether the legislature has adopted strict liability by statute is not presented. We do, however, find some guidance in Alabama's version of the UCC of what the legislative policy is. The "non-uniform" version of the UCC, adopted in 1965 as Act No. 549, effective January 1, 1967, attached six major amendments to the UCC. They are as follows:
(1) § 2-316 was amended to add subsection 5 prohibiting the seller from limiting or excluding his liability for damages for *Page 142 
injuries to the person in the case of consumer goods.
(2) § 2-318 was amended to extend the ambit of the seller's warranty to any natural person who might reasonably be expected to use, consume or be affected by the goods.
(3) § 2-714 (2) was amended so as to make it clear that the damages allowable in actions for injury to the person are the same as those damages ordinarily allowable in such actions at law.
(4) § 2-715 (2) (b) was added to allow the recovery of consequential damages in cases involving injuries to personal property resulting from a breach of warranty.
(5) § 2-719 (4) was added to prevent the seller from contractually modifying or limiting the buyer's remedy in cases for damages for injury to the person in the case of consumer goods.
(6) § 2-725 (2) was amended to provide that a cause of action for injury to the person in the case of consumer goods arises when the injury occurs as opposed to when the sale takes place, thus extending the statute of limitations.
These amendments serve as an expression of public policy. In adopting these amendments, the legislature departed from the strict rule of privity in products liability cases and otherwise augmented the rights of injured consumers. These amendments have led Dean Prosser, as mentioned above, to conclude that Alabama has adopted strict tort liability by statute. We do not necessarily agree with this. We do believe, however, that defendants who are ordinarily engaged in the business of marketing products should be liable for the foreseeable harm proximately resulting from defective conditions in the products which make them unreasonably dangerous.
Such a policy is not unreasonable and is compatible with the policy of the legislature as demonstrated by the amendments to the UCC. We are of the opinion that the legislature has made manifest that policy of the state by expanding the UCC. Relevant to both parties' arguments is Geohagan. There, this Court held that even though the legislature had expanded the cause of action for breach of warranty, the Wrongful Death Statute, Title 7, § 123, Code, was not affected, as the basis of the action was still contractual. American Motors implies that since the legislature has not spoken on the subject sinceGeohagan, it does not want to expand the law of torts in Alabama to include strict liability. This may be true, but, since we are not adopting the doctrine, we see no need to speak to that argument.
Developing case law in accord with the announced public policy of the State has always been conceded to be a proper role for this Court. Proving want of due care in products liability cases involving complicated manufacturing processes can be almost impossible; the plaintiff should not be forced to prove more than that the defendants placed on the market a product not reasonably safe when used for its intended purpose and that, as a proximate result, injury ensued.
 DEFECTIVE CONDITION
American Motors asks: What products are covered? What is a "defect"? It is not tautological to answer that a "defect" is that which renders a product "unreasonably dangerous," that is, not fit for the ordinary purposes intended, and that all such "defective" products are covered. Ordinarily, under our system whether a product is "unreasonably dangerous" is for the trier of fact, just as negligence vel non normally is. Numerous past decisions have given meaning to "defect" and "defective products" and can provide whatever guidance is needed. See also Restatement of Torts 2d, § 402A, and Comment. *Page 143 
 ALLOWABLE DEFENSES
Ordinarily, defenses fall within two categories: (1) general denials and (2) affirmative defenses. Thus, the defenses available in a products liability case may be more meaningfully denominated and discussed in the context of the plaintiff's burden of proof.
As we have observed, a prima facie case is established when the plaintiff proves substantially the elements set out in the Restatement of Torts 2d, § 402A. Under the general denial, in addition to casting the burden on plaintiff to prove sufficient facts from which each of these elements can be inferred, the defendant may offer evidence to counter the plaintiff's prima facie case. For example, where the plaintiff's evidence supports an inference that the product was defective when it left the manufacturer's possession and control, the manufacturer can counter this inference by evidence proving, or tending to prove, that the defect, if any, occurred while under the possession or control of the distributor or retailer.
Additionally, the following affirmative defenses are available:
(1) Causal Relation. The defendant may establish that there is no causal relation in fact between his activities in connection with handling the product and its defective condition. For example, the defendant may show that he is in the business of either distributing or processing for distribution finished products; he received a product already in a defective condition; he did not contribute to this defective condition; he had neither knowledge of the defective condition, nor an opportunity to inspect the product which was superior to the knowledge or opportunity of the consumer.[4]
This "lack of causal relation" defense is not to be understood as being available to the manufacturer where the defect is in a component part made by a third party or to a defendant who distributes a product under his own trade name.Sears Roebuck v. Morris, supra.
(2) Assumption of Risk. The defendant may establish that he sold a product which was unavoidably unsafe and the danger was either apparent to the consumer or the seller adequately warned the consumer of the danger. (See Comment g, h, i, j, and k to § 402A of the Restatement for a discussion of defective condition, unreasonably dangerous, directions and warnings, and unavoidably unsafe products.)[5]
This is not a contributory negligence defense; rather, it is an assumption of risk defense, which ordinarily, when raised, will be a question of fact for the jury. For a clear statement of this assumption of risk rule, we adopt the following language from Comment n to § 402A of the Restatement:
 ". . . If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.
(3) Contributory Negligence. As in all negligence actions, the defense of contributory negligence is available in proper cases (e.g., plaintiff's misuse of the product).
 DAMAGES FOR WRONGFUL DEATH
American Motors argues that no action for wrongful death has been stated because the avowed purpose of Title 7, § 123, is punitive, and it would be wrong to *Page 144 
apply it and punish the defendant who has committed no wrongful act. We simply hold that the wrongful act within the meaning of the statute is placing an unreasonably dangerous product on the market.
Admittedly, if the retailer here were a party to the instant suit and if the Restatement's pure no-fault concept were applied, the exclusively punitive purpose of our wrongful death statute would indeed be frustrating. Not so, however, under the retention of culpability causally related in fact between the conduct of the defendant and the defective condition of the product. Damages are to be awarded that will punish the tortfeasor for the act and deter him and others from similar future conduct. Pointing out the difficulty a jury might have in determining the amount of damages is confusing the purpose of the award with its measurement. That task should be no more difficult in this case than in any other death case.
 CONCLUSION
We have not attempted to answer all the questions which may arise on the trial of every products liability case. We believe, however, that our holding is sufficiently detailed to serve as a general guide for the disposition of the principal issues presented for adjudication on remand.
The order of dismissal is reversed and the trial Court is ordered to reinstate the claim so that Atkins' administratrix can attempt to prove that the defendant marketed a product that was not reasonably safe when used for its intended purpose. If she can prove that the product was not reasonably safe, she will have proved negligence.
 REVERSED AND REMANDED.
All the Justices concur.
[1] The instant case and the case of Casrell v. Altec Industries,Inc., 295 Ala. ___, 335 So.2d 128 [1976] (each case resulting in a reversal of an order of dismissal of a count substantially tracking the Restatement of Torts 2d, § 402A), were decided and released for publication simultaneously. Both cases should be read together for a full understanding of our holdings.
[2] Although the averment of "negligence" is not essential, a pleading reference to "extended manufacturer's liability for defective products" would be helpful in order to identify this type of action.
[3] Traynor, "The Ways and Meanings of Defective Products and Strict Liability," 32 Tenn.L.R. 363, 965.
[4] "Causal relation", used here in the context of an affirmative defense, is not to be confused with the burden which rests on the plaintiff to prove that his injuries and damages were the proximate result of the defective condition of the product.
[5] Although our holding modifies the Restatement's theory of strict liability, the Comment, in large measure, retains its utility; therefore, we attach the official Comment to § 402 A as an appendix hereto.
AP APPENDIX
 TOPIC 5. STRICT LIABILITY
§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 See Reporter's Notes.
Caveat:
The Institute expresses no opinion as to whether the rules stated in this Section may not apply
(1) to harm to persons other than users or consumers;
(2) to the seller of a product expected to be processed or otherwise substantially changed before it reaches the user or consumer; or
(3) to the seller of a component part of a product to be assembled.
Comment:
a. This Section states a special rule applicable to sellers of products. The rule is *Page 145 
one of strict liability, making the seller subject to liability to the user or consumer even though he has exercised all possible care in the preparation and sale of the product. The Section is inserted in the Chapter dealing with the negligence liability of suppliers of chattels, for convenience of reference and comparison with other Sections dealing with negligence. The rule stated here is not exclusive, and does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved.
b. History. Since the early days of the common law those engaged in the business of selling food intended for human consumption have been held to a high degree of responsibility for their products. As long ago as 1266 there were enacted special criminal statutes imposing penalties upon victualers, vintners, brewers, butchers, cooks, and other persons who supplied "corrupt" food and drink. In the earlier part of this century this ancient attitude was reflected in a series of decisions in which the courts of a number of states sought to find some method of holding the seller of food liable to the ultimate consumer even though there was no showing of negligence on the part of the seller. These decisions represented a departure from, and an exception to, the general rule that a supplier of chattels was not liable to third persons in the absence of negligence or privity of contract. In the beginning, these decisions displayed considerable ingenuity in evolving more or less fictitious theories of liability to fit the case. The various devices included an agency of the intermediate dealer or another to purchase for the consumer, or to sell for the seller; a theoretical assignment of the seller's warranty to the intermediate dealer; a third party beneficiary contract; and an implied representation that the food was fit for consumption because it was placed on the market, as well as numerous others. In later years the courts have become more or less agreed upon the theory of a "warranty" from the seller to the consumer, either "running with the goods" by analogy to a covenant running with the land, or made directly to the consumer. Other decisions have indicated that the basis is merely one of strict liability in tort, which is not dependent upon either contract or negligence.
Recent decisions, since 1950, have extended this special rule of strict liability beyond the seller of food for human consumption. The first extension was into the closely analogous cases of other products intended for intimate bodily use, where, for example, as in the case of cosmetics, the application to the body of the consumer is external rather than internal. Beginning in 1958 with a Michigan case involving cinder building blocks, a number of recent decisions have discarded any limitation to intimate association with the body, and have extended the rule of strict liability to cover the sale of any product which, if it should prove to be defective, may be expected to cause physical harm to the consumer or his property.
c. On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products. *Page 146 
d. The rule stated in this Section is not limited to the sale of food for human consumption, or other products for intimate bodily use, although it will obviously include them. It extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer. Thus the rule stated applies to an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair, and an insecticide. It applies also to products which, if they are defective, may be expected to and do cause only "physical harm" in the form of damage to the user's land or chattels, as in the case of animal food or a herbicide.
e. Normally the rule stated in this Section will be applied to articles which already have undergone some processing before sale, since there is today little in the way of consumer products which will reach the consumer without such processing. The rule is not, however, so limited, and the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated is subject to the liability here stated.
f. Business of selling. The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home.
The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not apply to the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer in used cars, and this even though he is fully aware that the dealer plans to resell it. The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence. An analogy may be found in the provision of the Uniform Sales Act, § 15, which limits the implied warranty of merchantable quality to sellers who deal in such goods; and in the similar limitation of the Uniform Commercial Code, § 2-314, to a seller who is a merchant. This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like.
g. Defective condition. The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.
Safe condition at the time of delivery by the seller will, however, include proper packaging, necessary sterilization, and *Page 147 
other precautions required to permit the product to remain safe for a normal length of time when handled in a normal manner.
h. A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, or from abnormal preparation for use, as where too much salt is added to food, or from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate warning of the danger (see Comment j), and a product sold without such warning is in a defective condition.
The defective condition may arise not only from harmful ingredients, not characteristic of the product itself either as to presence or quantity, but also from foreign objects contained in the product, from decay or deterioration before sale, or from the way in which the product is prepared or packed. No reason is apparent for distinguishing between the product itself and the container in which it is supplied; and the two are purchased by the user or consumer as an integrated whole. Where the container is itself dangerous, the product is sold in a defective condition. Thus a carbonated beverage in a bottle which is so weak, or cracked, or jagged at the edges, or bottled under such excessive pressure that it may explode or otherwise cause harm to the person who handles it, is in a defective and dangerous condition. The container cannot logically be separated from the contents when the two are sold as a unit, and the liability stated in this Section arises not only when the consumer drinks the beverage and is poisoned by it, but also when he is injured by the bottle while he is handling it preparatory to consumption.
i. Unreasonably dangerous. The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fusel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.
j. Directions or warning. In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to *Page 148 
find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.
But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized. Again the dangers of alcoholic beverages are an example, as are also those of foods containing such substances as saturated fats, which may over a period of time have a deleterious effect upon the human heart.
Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.
k. Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is itunreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
l. User or consumer. In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller, although the rule applies equally if he does so. He may have acquired it through one or more intermediate dealers. It is not even necessary that the consumer have purchased the product at all. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser. The liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and the defendant.
"Consumers" include not only those who in fact consume the product, but also those who prepare it for consumption; and the housewife who contracts tularemia while cooking rabbits for her husband is included within the rule stated in this Section, as is also the husband who is opening a bottle of beer for his wife to drink. Consumption includes all ultimate uses for which the product is intended, and the customer in a beauty shop to whose hair a permanent wave solution is applied by the shop is a consumer. "User" includes those who are *Page 149 
passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, as well as those who are utilizing it for the purpose of doing work upon it, as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased.
Illustration:
 1. A manufactures and packs a can of beans, which he sells to B, a wholesaler. B sells the beans to C, a jobber, who resells it to D, a retail grocer. E buys the can of beans from D, and gives it to F. F serves the beans at lunch to G, his guest. While eating the beans, G breaks a tooth, on a pebble of the size, shape, and color of a bean, which no reasonable inspection could possibly have discovered. There is satisfactory evidence that the pebble was in the can of beans when it was opened. Although there is no negligence on the part of A, B, C, or D, each of them is subject to liability to G. On the other hand E and F, who have not sold the beans, are not liable to G in the absence of some negligence on their part.
m. "Warranty." The liability stated in this Section does not rest upon negligence. It is strict liability, similar in its nature to that covered by Chapters 20 and 21. The basis of liability is purely one of tort.
A number of courts, seeking a theoretical basis for the liability, have resorted to a "warranty," either running with the goods sold, by analogy to covenants running with the land, or made directly to the consumer without contract. In some instances this theory has proved to be an unfortunate one. Although warranty was in its origin a matter of tort liability, and it is generally agreed that a tort action will still lie for its breach, it has become so identified in practice with a contract of sale between the plaintiff and the defendant that the warranty theory has become something of an obstacle to the recognition of the strict liability where there is no such contract. There is nothing in this Section which would prevent any court from treating the rule stated as a matter of "warranty" to the user or consumer. But if this is done, it should be recognized and understood that the "warranty" is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales.
The rule stated in this Section does not require any reliance on the part of the consumer upon the reputation, skill, or judgment of the seller who is to be held liable; nor any representation or undertaking on the part of that seller. The seller is strictly liable although, as is frequently the case, the consumer does not even know who he is at the time of consumption. The rule stated in this Section is not governed by the provisions of the Uniform Sales Act, or those of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties, or by limitation to "buyer" and "seller" in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act. The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. In short, "warranty" must be given a new and different meaning if it is used in connection with this Section. It is much simpler to regard the liability here stated as merely one of strict liability in tort.
n. Contributory negligence. Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict *Page 150 
liability cases (see § 524) applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.
Comment on Caveat:
o. Injuries to non-users and non-consumers. Thus far the courts, in applying the rule stated in this Section, have not gone beyond allowing recovery to users and consumers, as those terms are defined in Comment l. Casual bystanders, and others who may come in contact with the product, as in the case of employees of the retailer, or a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery. There may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded, other than that they do not have the same reasons for expecting such protection as the consumer who buys a marketed product; but the social pressure which has been largely responsible for the development of the rule stated has been a consumers' pressure, and there is not the same demand for the protection of casual strangers. The Institute expreses neither approval nor disapproval of expansion of the rule to permit recovery by such persons.
p. Further processing or substantial change. Thus far the decisions applying the rule stated have not gone beyond products which are sold in the condition, or in substantially the same condition, in which they are expected to reach the hands of the ultimate user or consumer. In the absence of decisions providing a clue to the rules which are likely to develop, the Institute has refrained from taking any position as to the possible liability of the seller where the product is expected to, and does, undergo further processing or other substantial change after it leaves his hands and before it reaches those of the ultimate user or consumer.
It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability under the rule stated in this Section. If, for example, raw coffee beans are sold to a buyer who roasts and packs them for sale to the ultimate consumer, it cannot be supposed that the seller will be relieved of all liability when the raw beans are contaminated with arsenic, or some other poison. Likewise the seller of an automobile with a defective steering gear which breaks and injures the driver, can scarcely expect to be relieved of the responsibility by reason of the fact that the car is sold to a dealer who is expected to "service" it, adjust the brakes, mount and inflate the tires, and the like, before it is ready for use. On the other hand, the manufacturer of pigiron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer. The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes. No doubt there will be some situations, and some defects, as to which the responsibility will be shifted, and others in which it will not. The existing decisions as yet throw no light upon the questions, and the Institute therefore expresses neither approval nor disapproval of the seller's strict liability in such a case.
q. Component parts. The same problem arises in cases of the sale of a component *Page 151 
part of a product to be assembled by another, as for example a tire to be placed on a new automobile, a brake cylinder for the same purpose, or an instrument for the panel of an airplane. Again the question arises, whether the responsibility is not shifted to the assembler. It is no doubt to be expected that where there is no change in the component part itself, but it is merely incorporated into something larger, the strict liability will be found to carry through to the ultimate user or consumer. But in the absence of a sufficient number of decisions on the matter to justify a conclusion, the Institute expresses no opinion on the matter.