Clifford JONES, Donald Fisk, Sarah Conklin and Joshua Rumohr, Plaintiffs,

v.

HAWKER BEECHCRAFT CORPORATION, Defendant.

Civil Action No. 3:11–cv–79–TCB.

United States District Court, N.D. Georgia, Newnan Division.

Jan. 22, 2014.

Kevin R. Dean, Motley Rice, LLC, Mt. Pleasant, SC, for Plaintiffs.

David S. Wooding, William L. Oliver, Jr., Martin, Pringle, Oliver, Wallace & Bauer, LLP, Wichita, KA, Hugh Brown McNatt, McNatt, Greene & Peterson, Vidalia, GA, Thomas Joshua Archer, Balch & Bingham LLP, Atlanta, GA, for Defendant.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

Before the Court is Defendant Hawker Beechcraft Corporation's motion for summary judgment [43].

### I. Background

On May 15, 2009, Sanford Jones piloted a Hawker Beechcraft Bonanza plane from Newnan, Georgia, to Destin, Florida; on the return flight to Newnan, the plane ran out of fuel and crashed during an emergency landing near Auburn, Alabama. Plaintiffs Sarah Conklin and Joshua Rumohr were passengers on the plane and were injured in the crash. Plaintiff Donald Fisk represents the estate of Alexander Medina, who was sitting in the co-pilot's seat and was killed in the crash. Plaintiff Clifford Jones represents the estate of his father, Sanford Jones, who died as a result of the crash.

Thirty minutes before the crash, Conklin took a photograph of the plane's control panel. In the picture, the fuel gauge for the left main tank indicates that the tank is five-eighths full, and the right gauge indicates that the right main tank is one-quarter full. The plane also had tip tanks, each of which contained approximately ten gallons of fuel. Shortly after Conklin took the photograph, Jones reported that he was having engine problems, and the engines then quit. The plane subsequently crashed when Jones attempted an emergency landing.

On May 13, 2011, Plaintiffs filed this products-liability action against Hawker Beechcraft, seeking to recover damages

for wrongful death and personal injury based on theories of strict liability and negligence. Plaintiffs contend that the left main fuel bladder was attached to the interior of the wing with diamond-shaped snaps and that some of those snaps had become unfastened, causing the left fuel bladder to droop. Plaintiffs aver that the drooping fuel bladder interfered with the fuel-level transmitters in the left wing, and as a result the left fuel gauge in the cockpit showed more fuel than the tank actually contained.

After the plane's annual inspection on April 2, 2009, John Hickman, who performed all maintenance on the plane in the year preceding the accident, certified that the plane was airworthy as of that date. In making his inspection, Hickman used his own checklist instead of the Hawker Beechcraft checklist for the Bonanza aircraft. During his inspection, Hickman inspected the seal of the fuel cap and looked at the top of the wing to see if fuel was venting around the cap. Hickman also used a flashlight and mirror to inspect the tank and ensure that it was not wrinkled or collapsed; he was not aware of any problems with the fuel bladders. Finally, even though this was not on his checklist, Hickman checked the fuel level in the tanks with the cockpit fuel gauges to see if the gauges were "about right." According to Hickman, the indicators "aren't perfect," and "the only time they have to be correct is when the tank is empty." By signing the annual inspection, Hickman certified that to the best of his knowledge, everything was operating properly.

Although Jones was piloting the plane the day of the crash, Robert Haver was the plane's principal pilot. Before the plane was purchased by Louis Levenson in 2008, Haver reviewed its maintenance records. He did not see any problems with the fuel gauge noted in the records, and he

never had any problems with the fuel gauges. During his preflight inspections, Haver would remove the fuel caps and check to see if the main fuel tanks still appeared full, i.e., that fuel had not been stolen or leaked out.

On September 9, 2013, Hawker Beechcraft filed motions for summary judgment [43] and to exclude Plaintiffs' experts, Lee Coffman and Mark Hood [44]. On December 16, the Court issued an order granting Hawker Beechcraft's motion to exclude Coffman's and Hood's testimony. Plaintiffs' remaining expert is Lyle Schaefer, a qualified engineering test pilot who offers normal-piloting expert opinions, but Plaintiffs do not cite his testimony in their brief in opposition to Hawker Beechcraft's motion for summary judgment. Hawker Beechcraft's expert is Dale E. Alexander, Ph.D., P.E., who opines that the snaps were engaged when the plane left Hawker Beechcraft's manufacturing facility.

The Court now addresses Hawker Beechcraft's motion for summary judgment.

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.CIV.P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Investor Grp. v. FindWhat.com,* 658 F.3d 1282, 1307 (11th Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and

draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1437–38 (11th Cir.1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). The second is to show that "there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548).

If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Id.* At this point, the nonmoving party must " 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 593–94 (11th Cir.1995) (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548).

## III.  Analysis

■  As stated above, Plaintiffs assert products-liability claims sounding in strict liability and negligence, and the parties agree that Alabama state law governs the claims. However, "strict liability" is not the appropriate label. Under Alabama law, a plaintiff injured by a defective product may recover under one of three legal theories: (1) breach of implied warranty of merchantability; (2) common-law negli-

gence; and (3) liability under the Alabama extended manufacturer's liability doctrine ("AEMLD"). *Ford Motor Co. v. Burdeshaw,* 661 So.2d 236, 237 (Ala.1995). Plaintiffs' claims are based on the latter two theories. Thus, what Plaintiffs have labeled as a "strict liability" claim is really an AEMLD claim. The Court begins with analyzing this claim and then addresses Plaintiffs' common-law negligence claim.

### A.  AEMLD Claim

Hawker Beechcraft contends that for Plaintiffs' AEMLD claim to succeed, Plaintiffs must show that the plane was defective when it left Hawker Beechcraft's factory. It argues that Plaintiffs have failed to present any evidence that the plane was defective upon leaving Hawker Beechcraft's control.

Plaintiffs respond that they are not required to show the specific defect with the plane, only that there was some defect with the plane. They argue that they have created a genuine dispute of material fact on this issue by showing that Hawker Beechcraft fuel gauges have a history of inaccuracy and that the left fuel gauge displayed more fuel than the tank actually contained. Plaintiffs also argue that even if they have to show a specific defect, they have presented sufficient evidence to create a genuine dispute of material fact as to whether the fuel bladder was improperly installed and caused the inaccurate gauge-reading.

To succeed on an AEMLD claim, Plaintiffs must show that (1) they suffered injury or damage (2) because Hawker Beechcraft sold a plane in a "defective condition unreasonably dangerous" to (3) Plaintiffs as the "ultimate user[s] or consumer[s]" if (4) Hawker Beechcraft was engaged in the business of selling such planes, and (5) the plane was expected to, and did, reach Plaintiffs without substantial change in

condition from when it was sold. *Jordan v. Gen. Motors Corp.*, 581 So.2d 835, 836 (Ala.1991) (quoting *Atkins v. Am. Motors Corp.*, 335 So.2d 134, 141 (Ala.1976)). In this case, the dispute centers on the second element.

■ Establishing fault under the AEMLD requires Plaintiffs to provide more than "mere proof that an accident occurred with resulting injuries." *Id.* Plaintiffs "must affirmatively show that the product was sold with a defect or in a defective condition." *Id.* at 837. A defect "renders a product unreasonably dangerous, i.e., not fit for its intended purpose," and a defective condition exists when "at the time the product leaves the seller's hands, it is in a condition not contemplated by the ultimate consumer." *Id.* (internal quotation marks and citation omitted).

### 1. Inaccurate Fuel Gauge

Plaintiffs argue that they do not have to show a specific defect with the plane, only that there was some defect with the plane. They contend that "some defect" existed in the left fuel gauge, which showed more fuel than the left tank actually contained. Hawker Beechcraft responds that "Plaintiffs have never before claimed the fuel gauge itself was defective" but have instead focused on the defective left fuel tank, which allegedly impaired the proper functioning of the fuel gauge.

The Court need not address Plaintiffs' "specific versus some defect" argument. Even if Plaintiffs do not have to show a specific defect, they still have to show that the plane had a defect or was in a defective condition when it left Hawker Beechcraft's control. Plaintiffs have not presented any evidence that the left fuel gauge was defective when it left Hawker Beechcraft's facility.

■ To support their contention that the left fuel gauge was defective, Plaintiffs rely on the photograph of the fuel gauge taken during the accident flight and Coffman's testimony. As stated above, the Court issued an order that granted Hawker Beechcraft's motion to exclude Coffman's testimony under *Daubert*. Without his testimony, Plaintiffs have only the photograph as evidence that the fuel gauge was defective. The photograph, however, does not show that the gauge was defective when it left Hawker Beechcraft's control.

Even if the Court were to allow Coffman's testimony, it would not create a genuine dispute of fact on this issue. Coffman opined in his report, "There has been a long history of fuel quantity issues in Beech Bonanza aircraft over the years." When asked for the basis of this opinion during his deposition, he testified that he had been "troubleshooting, working on Bonanza fuel quantity gauges most of [his] career." He was then asked if the issues with the fuel gauges were well known, and he answered, "Yes. If you read the Bonanza Society newsletters and go and look at that information, there is all kinds of people talking about the inaccuracy of the gauges and the problems with keeping them working properly." Coffman does not elaborate further on his experience with or the newsletters' content about the fuel gauges.

For example, Coffman does not state whether his experience is with the same type of plane or gauge that are involved in this case, nor does he describe the circumstances from his own experience under which the gauges failed, i.e., whether the failure is a defect or caused by operator or maintenance errors. Similarly, Coffman does not elaborate on whether the newsletter discussions are about the same type of plane or gauge that are involved in this

case or on the circumstances under which the gauges failed as reported in the newsletters. *Cf. Gen. Motors Corp. v. Johnston*, 592 So.2d 1054, 1059 (Ala.1992) (lower court properly admitted 251 customer reports of stalling problems caused mainly by same alleged defect in other vehicles with *identical engines* as one at issue). Thus, Coffman's report and testimony do not provide evidence of substantially similar fuel-gauge failures that support Plaintiffs' contention that the fuel gauge in this case was defective when it left Hawker Beechcraft's factory.

And Coffman's other testimony undermines his opinion and testimony that the inaccuracy of the fuel gauge in this plane was well known. Coffman was asked if a Bonanza pilot would not rely upon his fuel gauges due to what he identified as a well-known issue with the accuracy of the fuel gauges. He responded, "I can't say what a Bonanza pilot would do. It depends on the age of the airplane, the system. The system has changed over the years. The gauges have certainly gotten more accurate than they used to be back in the '70s and the '80s." When asked if the plane at issue used the most recent version of the gauges, Coffman testified that the more recent gauges "are the more adjustable, more accurate gauges that have been produced." This testimony shows the importance of knowing the type of planes that he worked on and were mentioned in the newsletters. It also shows that the allegedly notorious inaccuracies did not result in an industry-wide practice of not relying on the gauges.

The plane in this case was manufactured in the late 1990s; consequently, only issues with this plane model and the newer gauges are relevant. Coffman was questioned about whether he thought the fuel gauges in this type of plane had been inaccurate before. He testified,

I can't say whether it did or did not. All I can say is as a mechanic and as a pilot, I can tell you from all of the Bonanzas that I ever flew that I regularly check the tanks not once a year, I check them almost every flight to see if they were holding what I suspected they held and that the indicators were giving me readings throughout that flight. However, I am a mechanic that's had—ferried broken airplanes my entire career.

He essentially testifies that he does not know whether the fuel gauges have a history of inaccuracy and that he checks the tanks as frequently as he does because he is a mechanic.

Thus, looking at Coffman's testimony in toto, it does not indicate that the fuel gauges of the plane at issue were defective when the plane left Hawker Beechcraft's facility. Nor does his testimony indicate anything about substantially similar events involving the type of plane and fuel gauge involved in this case. Consequently, Coffman's testimony does not create a genuine dispute as to whether the fuel gauge was defective when it left Hawker Beechcraft's control.

In passing, Plaintiffs also cite to a few lines of Haver's deposition testimony. However, the one-page excerpt of his deposition testimony that Plaintiffs filed with their opposition brief does not help them. In the excerpt, Haver describes how he tested the fuel-gauge accuracy of one of the several planes Levenson has owned, but it is unclear whether Haver is testifying about the accident plane. Moreover, Haver testifies that the gauges on this unknown plane "were correct all the way through." So, even if he is discussing the accident aircraft, the gauges were accurate.

Haver then testifies, "Now the one we just bought, they were terrible all the way through from beginning to end, they never

read right." Plaintiffs contend that Levenson purchased another Hawker Beechcraft plane after the accident, presumably suggesting that Haver is testifying about the gauges in this newly purchased plane. However, Haver does not identify the type of plane purchased, and even Plaintiffs do not state whether the same type of gauge as the accident plane was in the replacement plane. Thus, Haver's testimony does not help Plaintiffs.

Without the support of Coffman's and Haver's testimony, Plaintiffs are left with just the photograph that shows the left gauge displaying the fuel level shortly before the plane crashed. But Plaintiffs have not shown, and the photograph by itself does not show, that the aircraft was in a defective condition at the time it left Hawker Beechcraft's control. *See Allstate Ins. Co. v. Mitsubishi Elecs. Am., Inc.,* 709 So.2d 1306, 1308–09 (Ala.Civ.App.1998) (plaintiff offered only speculation that television cord had a defect when it left defendant's control, as her expert could not say how or when injury to cord occurred). Consequently, Plaintiffs have not shown that the photograph is enough to save their AEMLD claim from summary judgment, i.e., that evidence of some pre-accident failure with the plane, which occurred at some unknown time, creates a genuine dispute as to whether this failure is a defect or defective condition that was present when the plane left Hawker Beechcraft's control. *See Sapp v. Beech Aircraft Corp.,* 564 So.2d 418, 420 (Ala.1990) (affirming summary judgment in favor of defendant because evidence only showed seatbelt failed during crash but not that seatbelt was defective when it left defendant's control).

### 2. Fuel–Tank Snaps

■ Plaintiffs' other alleged defect is the unfastened fuel-tank snaps, which became unfastened because Hawker Beechcraft improperly installed the left fuel tank. Plaintiffs contend that the unfastened snaps caused the fuel tank to droop; the drooping tank interfered with the fuel-level transmitter; and the transmitter caused the fuel gauge to show more fuel than the tank actually contained. To support this theory, Plaintiffs rely on the testimony of Coffman and Hood. Consequently, the Court's exclusion of this testimony means that Plaintiffs have no evidence that the snaps were defective or that the drooping fuel tank caused the erroneous fuel-gauge reading.

And again, even if their testimony were considered, Plaintiffs' AEMLD claim would not survive summary judgment. Neither Coffman nor Hood testified with any degree of certainty that the snaps were unfastened when the plane left Hawker Beechcraft's facility or that the drooping fuel tank would or could cause the fuel gauge to display an erroneously high fuel level. In fact, Coffman testified that the drooping fuel tank could cause the fuel gauge to indicate *less* fuel than was actually in the tank, i.e., the opposite of what Plaintiffs allege happened in this case.

Thus, based on the present record Plaintiffs have failed to establish Hawker Beechcraft's liability under the AEMLD for either alleged defect. *See Mitsubishi,* 709 So.2d at 1308 (plaintiff failed to carry her burden on AEMLD claim where her expert offered only speculation that injury to cord, which allegedly caused fire, occurred before television left defendant's control, as he could not say what caused the injury or when injury occurred). Accordingly, the Court will grant Hawker Beechcraft summary judgment on this claim.

### B. Common–Law Negligence

In their common-law negligence claim, Plaintiffs contend that the accident was

caused, in whole or in part, by Hawker Beechcraft's negligent failure to properly and effectively assemble and inspect the plane and its parts. Specifically, they aver that the left fuel tank and fuel gauge were defective and that Hawker Beechcraft negligently assembled and inspected these parts. Hawker Beechcraft contends that Plaintiffs cannot show that it breached any duty owed to them or a causal link between their injuries and Hawker Beechcraft's conduct.

To recover on a negligence claim under Alabama law, Plaintiffs must show that (1) Hawker Beechcraft owed them a duty; (2) Hawker Beechcraft breached that duty; (3) Plaintiffs suffered a loss or an injury; and (4) Hawker Beechcraft's negligence was the actual and proximate cause of that loss or injury. *Burdeshaw*, 661 So.2d at 238. Plaintiffs must establish "not only that the product at issue is defective, but also that the manufacturer failed to exercise due care in the product's manufacture, design, or sale." *McMahon v. Yamaha Motor Corp., U.S.A.*, 95 So.3d 769, 772 (Ala.2012).

Plaintiffs' only evidence that the plane was defective and that Hawker Beechcraft negligently assembled and inspected the plane and its parts is the fact that the plane crashed because it ran out of fuel in the main tanks; the photograph that allegedly shows sufficient fuel in the left main tank to complete the flight; and Coffman's and Hood's testimony that the snaps had been unfastened for an extended period of time.

The exclusion of Coffman's and Hood's testimony, though, eliminates all of Plaintiffs' evidence that the fuel tank and snaps were defective; that Hawker Beechcraft breached a duty to properly and effectively assemble and inspect the left main fuel tank; and that Hawker Beechcraft caused their damages. Given the complexity of an airplane, expert testimony is essential to establishing the defective condition of the fuel tank and snaps and to showing that the fuel tank and snaps caused Plaintiffs' injuries. *See, e.g., McCreless v. Global Upholstery Co.*, 500 F.Supp.2d 1350, 1358 (N.D.Ala.2007) (summary judgment proper where plaintiff's expert's testimony necessary to show defective condition of a piston-and-bracket chair but lower court excluded under Daubert); *Bishop v. Bombardier, Inc.*, 399 F.Supp.2d 1372, 1382 (M.D.Ga.2005) (analyzing AEMLD and Alabama negligence claims and finding that expert testimony necessary to establish personal watercraft's engine compartment design was defective).

Even if the Court considered Coffman's and Hood's testimony, it would not create a genuine dispute of material fact as to Plaintiffs' negligence claim with respect to the fuel tank and snaps and Hawker Beechcraft's assembly and inspection thereof. Contrary to Plaintiffs' representation, Hood did not testify that the snaps were partially fastened or left unfastened during assembly; neither he nor Coffman could say how or when the snaps became unfastened. And Alexander, Hawker Beechcraft's expert, testified that the snaps were engaged when they left Hawker Beechcraft's factory; this has not been controverted. Thus, there is no evidence that the fuel tank and snaps were defective or that Hawker Beechcraft negligently assembled or inspected them.

In addition, Coffman did not testify that the drooping fuel tank would or could cause an erroneously *high* reading on the fuel gauge. Consequently, there is no evidence linking the unfastened snaps and fuel tank with the fuel-gauge reading captured in the photograph. That is, Plaintiffs have failed to present any evidence that the unfastened snaps and drooping fuel bag caused their injuries. *See Gooden*

*v. City of Talladega,* 966 So.2d 232, 240 (Ala.2007) ("question of proximate cause may be decided by a summary judgment if there is a total lack of evidence from which the fact-finder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury" (internal quotation marks and citations omitted)). Thus, summary judgment is appropriate on Plaintiffs' negligence claim with respect to the fuel tank and unfastened snaps.

Plaintiffs' only remaining evidence of Hawker Beechcraft's negligence is limited to the allegedly defective fuel gauge. In support of this portion of their negligence claim, Plaintiffs have only the photograph of the control panel shortly before the crash and the fact that the emergency landing was necessary because the plane ran out of fuel in the main tanks. But this evidence fails to create a genuine dispute of material fact as to Plaintiffs' claim that the gauge was defective and that Hawker Beechcraft negligently assembled and inspected the gauge.

Haver, the plane's principal pilot, testified that he reviewed the maintenance records before the plane was purchased, and he did not see any problems with the fuel gauges. Haver also testified that he never had any problems with the fuel gauges. In fact, there is no evidence about whether the gauge worked on the trip to Destin, when the fuel gauge stopped working, or whether the gauge (or the same model) even had a history of inaccuracy. Thus,

the evidence does not support Plaintiffs' argument that the fuel gauge was defective and that Hawker Beechcraft negligently assembled and inspected the fuel gauge and proximately caused their damages. *See Hughes v. Stryker Corp.,* 423 Fed.Appx. 878, 882 (11th Cir.2011) (summary judgment on plaintiff's Alabama negligence claim appropriate where plaintiff's circumstantial evidence created only speculation as to why her hip prosthesis failed and speculation does not create a genuine dispute of fact). Accordingly, the Court will grant Hawker Beechcraft summary judgment on Plaintiffs' negligence claim with respect to the defective fuel gauge and Hawker Beechcraft's negligent assembly and inspection thereof.

## C. Wrongful Death

Plaintiffs Clifford Jones and Donald Fisk have also pled a claim for wrongful death against Hawker Beechcraft. Under Alabama law, Jones and Fisk can maintain against Hawker Beechcraft only a wrongful-death action under ALA.CODE § 6–5–410 [1] and may recover only punitive damages in connection with that claim. *See Sledge v. IC Corp.,* 47 So.3d 243, 247 (Ala. 2010) (negligence and AEMLD claims cannot be maintained outside wrongful-death action; those counts are "mere variations" underlying the wrongful-death claim).

The wrongful-death statute provides that personal representatives may com-

---

[1.] The statute has language that limits the venue of such actions to Alabama. However, the Supreme Court has held that a state cannot limit venue in this way. *See Tenn. Coal, Iron, & R.R. Co. v. George,* 233 U.S. 354, 360, 34 S.Ct. 587, 58 L.Ed. 997 (1914) ("jurisdiction is to be determined by the law of the court's creation, and cannot be defeated by the extraterritorial operation of a statute of another state, even though it created the right of action"); *see also Slaton v. Hall,* 172 Ga. 675, 158 S.E. 747, 751 (1931) (applying *Tennessee*

*Coal* to Alabama wrongful-death statute and allowing claim to be brought in Georgia court).

Thus, any court that has jurisdiction over an Alabama wrongful-death action may hear the claim. Hawker Beechcraft has not challenged this Court's jurisdiction over it or the wrongful-death claim, and the Court has independently confirmed that it has subject-matter jurisdiction. Accordingly, the claim is properly before this Court.

**1318**

mence an action and recover damages "for the wrongful act, omission, or negligence of any ... corporation, ... whereby the death of the testator or intestate was caused, provided the testator or intestate could have commenced an action for the wrongful act, omission, or negligence if it had not caused death." ALA.CODE § 6–5–410(a). Jones and Fisk incorporate the complaint's previous allegations against Hawker Beechcraft into this claim; thus, the claim depends on the same wrongful acts, omissions and negligence addressed above.

As discussed *supra,* Plaintiffs have failed to create a genuine dispute of material fact as to Hawker Beechcraft's liability for negligence or under the AEMLD. Consequently, Jones and Fisk may not recover for that same conduct under this claim, and the Court will grant Hawker Beechcraft summary judgment thereon. *See Roberts v. NASCO Equip. Co.,* 986 So.2d 379, 386–87 (Ala.2007) (defendant entitled to summary judgment on wrongful-death claim where plaintiff failed to present evidence that product was sold with defect or in defective condition or that created a genuine dispute on this issue).

## IV.   Conclusion

As tragic as the accident was—which the Court deeply regrets—as a matter of law Hawker Beechcraft is entitled to summary judgment, and its motion [43] is GRANTED. The Clerk is DIRECTED to close the case.