Harriett Cooper appeals from a summary judgment entered in favor of Diversey Corporation.
Our review of the record reveals the following: From May 1992 until September 1993, Cooper worked at Aratex Services, Inc., a commercial laundry establishment. It would appear from the record that all but one of the chemicals used by Aratex in its laundering process are manufactured and supplied by Diversey Corporation.
While employed at Aratex, Cooper experienced certain respiratory and dermatological problems which, she says, were caused by handling wet clothes saturated with chemicals and by being exposed to certain fumes released by the chemicals. Specifically, Cooper experienced a cold, a dry cough, scar tissue on her lungs, shortness of breath, contact dermatitis, joint pain, dizziness, and weakness. Cooper testified that she had never experienced any of these problems prior to her employment with Aratex.
Cooper was ultimately diagnosed as having dermatomyositis, a connective tissue autoimmune disorder involving the skin/muscle, which can affect the lungs in terms of scarring. Cooper filed for, and received, workers' compensation benefits, and she is apparently now totally disabled because of her disorder.
Cooper eventually sued Diversey under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), alleging that her health problems were caused from exposure to various chemicals in the workplace which, she claimed, were unreasonably dangerous. The trial court entered a summary judgment in favor of Diversey. *Page 1246 
Cooper appeals. This case is before this court pursuant to Ala. Code 1975, § 12-2-7(6).
Initially, we note the following well-settled standard that this court must utilize in reviewing a summary judgment:
 "A summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P.; Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988). The party moving for a summary judgment must present, in support of its motion, evidence that would be admissible at trial. Rule 56(e), Ala. R. Civ. P. When the moving party makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the nonmoving party to rebut the showing by presenting substantial evidence creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is `of such weight and quality that fairminded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989). On review of the trial court's judgment, we are required to view the record in a light most favorable to the nonmovant and to resolve all reasonable doubts in favor of the nonmovant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413
(Ala. 1990)."
Cunningham v. Dabbs, 703 So.2d 979, 981 (Ala.Civ.App. 1997).
In Entrekin v. Atlantic Richfield Co., 519 So.2d 447, 449
(Ala. 1987), our supreme court stated the following regarding a claim filed under the AEMLD:
 "Under the AEMLD, a manufacturer, supplier, or seller who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, is negligent as a matter of law. In other words, the fault or negligence of the defendant is that he has conducted himself in a negligent manner by placing on the market a product that causes personal injuries . . . when put to its intended use. As long as there is a causal relationship between the defendant's conduct and the defective product, liability may attach, because an unreasonable risk of harm has been created."
(Emphasis added.)
Thus, Cooper must prove that she "suffered injury or damages to [herself] . . . by one who sold a product in a defective condition unreasonably dangerous to [Cooper] as the ultimate user or consumer." Atkins v. American Motors Corp., 335 So.2d 134, 141
(Ala. 1976).
In Jordan v. General Motors Corp., 581 So.2d 835, 837
(Ala. 1991), our supreme court stated the following in relation to a defective product:
 "`[A] "defect" is that which renders a product "unreasonably dangerous," i.e., not fit for its intended purpose. . . .
"`. . . .
 "`"Defective" is interpreted to mean that the product does not meet the reasonable expectations of an ordinary consumer as to its safety. Comment g. of the Restatement [Second of Torts (1965)] says defective condition applies when, at the time the product leaves the seller's hands, it is in a condition not contemplated by the ultimate consumer.'
 "Casrell [v. Altec Industries, Inc.], 335 So.2d [128,] 133 [(Ala. 1976)]."
In other words, "proof of a specific defect is not required if the product is unreasonably dangerous." Jordan, 581 So.2d at 837. "The question [of] whether a product is `unreasonably dangerous' is for the trier of fact, just as a question of negligence is."Yamaha Motor Co. v. Thornton, 579 So.2d 619, 621 (Ala. 1991).
Thus, the pertinent issues on appeal are whether Cooper presented substantial evidence that exposure to the *Page 1247 
chemicals proximately caused, or contributed to, her health problems, i.e., a causal connection, and, if so, whether Cooper presented substantial evidence that the chemicals were unreasonably dangerous. We emphasize that a "proximate cause issue generally is a question of fact to be determined by a jury." Lyon v. Volkswagen of America, Inc., 676 So.2d 356, 358
(Ala.Civ.App. 1996).
In support of its motion for a summary judgment, Diversey relied on the deposition testimony of Dr. Jack Hasson, who practices in pulmonary and critical care medicine. Dr. Hasson personally interviewed Cooper, "reviewed, her deposition testimony, reviewed her medical records, and reviewed a list of chemicals used by Aratex in the laundering process.
Dr. Hasson does not dispute that Cooper suffers from dermatomyositis. Instead, Dr. Hasson emphasized that dermatomyositis is a very vague diagnosis, which is based mainly on subjective criteria, and that it has no known etiology or cause. In sum, Dr. Hasson opined that Cooper's disorder was not occupational-related.
In opposition to Diversey's properly supported summary judgment motion, Cooper presented the deposition of Ronald N. Hunsinger, a professor of pathophysiology/toxicology. Hunsinger reviewed Cooper's deposition, reviewed her medical records, physically visited Aratex's plant, and reviewed a list of chemicals used by Aratex in the laundering process. The majority of Hunsinger's testimony related to the makeup of the various chemicals used by Aratex in the laundering process.
Hunsinger noted that several of the chemicals used by Aratex were silicate-based and that exposure to these silicate-based compounds could aggravate sensitive skin and respiratory conditions. Hunsinger testified as follows regarding these silicate-based compounds:
 "Q. What is the significance to the fact that we have a silicate compound?
 "A. . . . There is evidence in the medical literature now that silicates and silicones are related to connective tissue disorders like dermatomyositis.
 "Q. Did you review some medical literature, or do you know of medical literature which supports that opinion?
 "A. Yes. . . . There was recently a major study performed by Dr. Charles Hennekens . . . of the Harvard Medical School. It appeared in JAMA, the Journal of the American Medical Association. He had looked at a total of ten thousand, eight hundred thirty women who had had silicone breast implants and saw a significant increase in these women of the connective tissue collagen disorders, including . . . dermatomyositis. There was also another study done. I have the abstracts of this. It was done by some researchers from the University of Michigan, Ann Arbor, which associates silicone exposure and connective tissue diseases in women.
". . . .
 "Q. Did you find any medical literature which connects silicate-based laundry products to connective tissue disorders?
 "A. Not specifically laundry products, but silicate products themselves."
Hunsinger also discussed the various chemicals that contained fluoride compounds. Hunsinger noted that fluoride compounds heated at high temperatures could release fluorine gas, which is irritating to the skin and to the lungs. Hunsinger testified that when he visited Aratex's plant, he observed water in the floor drains that contained volatile organic chemicals — chemicals which will readily release vapors.
Additionally, some of the products manufactured by Diversey contained glycol ethers. Hunsinger noted the following regarding glycol ethers:
 "[G]lycol ethers are so toxic that in Europe most of them are being phased out in the laundry business. Recently they *Page 1248 
were added to the Toxic Substance Control Act's list of chemicals that have such suspected toxicity that the EPA is calling for even more testing on these substances."
Hunsinger further described the relationship between nonylphenoxy compounds and connective tissue disorders as follows:
 "A. . . . And the concern that I would have specifically with the nonylphenoxy compounds is that they are now considered to be very . . . estrogenic types of compounds.
"Q. Which means what?
 "A. [T]hey act like estrogen once they are absorbed into your system.
 "Q. And when it says that it defats the skin, that would be [to] reduce the natural oils from your skin?
 "A. That takes the oils out. That would allow a lot of chemicals in. If they came in contact with your hands, it could be taken right into the skin where normally they wouldn't be. It would allow, for example, some of those silicate compounds we talked about earlier to penetrate deeper into the skin and form antigenic type of substances.
". . . .
 "A. The connection is that the nonylphenoxy compounds, since they do act like estrogens, is that there is a connection between estrogen and the development or the risk of developing connective tissue autoimmune disorders.
 "Q. Did you look for or locate any medical literature that supports this relationship that you have just described between this being an estrogen-like product and the risk of developing connective tissue or autoimmune-type disorders?
 "A. Yes. First of all, it's generally known that these types of disorders occur two to three times more frequently in women than men, and that is believed by the body of medical science to be estrogen-related."
In essence, Hunsinger provided a very detailed analysis of the side effects, as well as the results, of being exposed to these various chemicals. Hunsinger opined that Cooper was exposed to most, if not all, of the chemicals manufactured by Diversey. And, while Hunsinger could not identify any one specific chemical which proximately caused Cooper's medical disorder, he, nevertheless, opined that any or all of them more than likely caused her disorder. In other words, Hunsinger opined that Cooper's disorder was occupational-related.
As can be seen from the above, this entire case hinges on proof in the form of expert testimony, which we find to be very conflicting. The evidence, however, when viewed in a light most favorable to Cooper, suggests that there was a causal connection between Cooper's exposure to the various chemicals and her medical disorder. Furthermore, whether the chemicals were unreasonably dangerous when put to their intended use is a question for the trier of fact. Yamaha Motor Co. v. Thornton,supra. In other words, we conclude that there existed genuine issues of material fact to be resolved by a jury.
Consequently, the judgment of the trial court is due to be reversed and the cause is remanded for proceedings consistent with this opinion.
The foregoing opinion was prepared by Retired Appellate Judge Richard L. Holmes while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Code 1975.
REVERSED AND REMANDED.
ROBERTSON, P.J., and YATES and MONROE, JJ., concur.
CRAWLEY and THOMPSON, JJ., dissent.