Ola May Abney, administratrix of the estate of her deceased great-niece, Sacorya Johnson, appeals the summary judgment for Crosman Corporation ("Crosman") and Owens True Value Hardware, Inc. ("Owens") (hereinafter referred to collectively as "the defendants"). We affirm.
 Facts and Procedural History
This case centers around the death of five-year-old Sacorya Johnson after she was struck and killed by a projectile fired from a Crosman 760 Pumpmaster pneumatic air rifle ("the gun"). The gun was manufactured by Crosman, a Delaware corporation with its principal place of business located in New York. The gun is designed to fire .177 caliber spherical projectiles, either steel ("BBs") or lead ("pellets"), at varying velocities, depending upon the number of times the gun is "pumped." It is capable of deploying a BB at a velocity anywhere between 315 feet per second (minimum velocity for 3 pumps) and 590 feet per second (maximum velocity for 10 pumps). A minimum of two pumps is necessary to fire a BB from the gun.
On the box in which Crosman packages the gun for retail sale, as well as inside the box, are numerous warnings indicating that the gun is not a toy and that it may cause "serious injury or death," as well as other similar warnings. The trigger of the gun is secured by a tamper-resistant device known as a trigger block. The key to unlock the trigger block is located in a sealed bag packaged elsewhere in the box. Sealed in this same bag is yet another warning.
It is undisputed that Crosman shipped the gun in its normal packaging, with a trigger-block attached, an owner's manual and trigger-block instructions enclosed, as well as the plastic bag containing the trigger-block key and the warning. (Abney's brief at 9-10; Crosman's brief at 63.)
The gun was received from Crosman by Owens, a domestic corporation with its principal place of business located in Monroeville. For many years, Owens has sold air rifles such as those manufactured by Crosman. In early February 2000, Pamela Rabb purchased the gun from Owens. Apparently Rabb purchased the display model of the gun, because at the time she purchased the gun Owens had no packaged guns of this type in stock. One of Owens's employees searched for the package in which the gun had originally been shipped, but could not find it.
Rabb purchased the gun as a birthday present for her youngest son, Plezarius, *Page 291 
whose seventh birthday was February 19, 2000. Plezarius had asked Rabb for a BB gun for his birthday. After Rabb had purchased the gun, but before Plezarius's birthday, Rabb's boyfriend, Johnifer Howard, took Plezarius to a remote location and taught him how to shoot the gun. In all, Plezarius had approximately eight opportunities to use the gun before the day of the shooting.
Despite the fact that she purchased the gun for Plezarius, Rabb indicated that she had several reservations about purchasing such a gun. As a child, Rabb had been struck in the knee by a pellet fired from an air rifle, and a doctor had had to dislodge the pellet. Further, around the time she bought the gun, windows in the neighborhood were being shot out by vandals using air rifles, and a local homeowner had telephoned the police to investigate. Additionally, Rabb's aunt had recently been "scraped across the head" by a BB fired from an air rifle and had had to seek medical attention. As a result of these events, Rabb testified, she was "really scared" of BB guns. Thus, although Rabb testified that she thought air rifles were "toys," she nevertheless "wanted somebody to be around [Plezarius] when he used" the gun. Rabb did not intend for Plezarius to use the gun without adult supervision. She offered two reasons for this precaution: her fear that Plezarius would shoot out windows and her fear that Plezarius would shoot a person. Furthermore, Rabb testified that she believed that the gun was capable of putting a person's eye out. Despite these concerns, Rabb stated that she did not believe that the gun could kill an individual.
Rabb made several statements about the gun to her children after she had purchased it. She testified that she did not personally give Plezarius any instructions concerning the proper use of the gun, except that she admonished him not to point the gun at people or at windows. Although the record reveals that Rabb was "positive" that she told Plezarius not to point the gun at anyone, mere moments later in her deposition testimony she categorically denied telling him this.
Plezarius testified that he knew that an air rifle was not a toy and that he knew that it could kill a person. Because the transcript of his deposition is incomplete, we do not know whether Plezarius attributed his belief in the lethality of the gun to statements made by his mother. However, his oldest brother, Jervomie, testified that Rabb had in fact told Plezarius that if he shot someone with a BB gun the person could be killed. Rabb's daughter, Shameka, also testified that she heard her mother tell Plezarius that somebody could be killed with the BB gun. Rabb's other son, D'Antonio, who is younger than Jervomie but older than Plezarius, testified that Rabb had told all three boys at the same time that an air rifle could potentially kill a person and that he knew that she "meant business."
Because Plezarius was not allowed to use the gun without adult supervision, Rabb placed the gun under her bed. Plezarius soon found it, however, and Rabb then moved the gun to the trunk of her automobile "to keep it away from him" when there was no adult to supervise him. She moved the gun to the trunk while the children were at school, and she believed that they were unaware of the new location for the gun. Although the trunk was locked, it could be opened by using a knife to "jimmy" the lock.
On March 9, 2000, although the exact circumstances are disputed, Plezarius got the gun from the trunk of the car, loaded it with three BBs given to him by a neighbor, and began walking around the neighborhood with the gun. He fired two shots *Page 292 
into the air, then continued walking up the road to the house of Annie Lou McQuitter Alexander, in whose yard Sacorya was playing. Standing just feet from Sacorya, Plezarius pointed the gun at her, pulled the trigger, and shot Sacorya in her left eye. The BB penetrated Sacorya's left eyelid, and lodged in her brain; she died from the wound two days later, on March 11, 2000.
On February 19, 2002, Abney filed the above-styled action in the Monroe Circuit Court. Her complaint contained eight "counts," six of which stated actual causes of action; the final two "counts" were an assertion of proximate cause and an assertion that Sacorya experienced pain and suffering. The six causes of action were (1) liability under the Alabama Extended Manufacturer's Liability Doctrine ("the AEMLD"); (2) negligence in the design, manufacture, and/or sale of the gun; (3) negligent and/or wanton failure to warn; (4) breach of express and/or implied warranties; (5) negligent and/or wanton packaging, marketing, and/or failure to warn, such conduct "render[ing] the product defective and unreasonably dangerous as defined under the AEMLD"; and (6) negligent and/or wanton supervision leading to the sale of the gun without its original packaging or accompanying warnings. The first five causes of action were brought against both Crosman and Owens, the sixth and final cause of action was brought only against Owens.
On March 29, 2004, Crosman moved for a summary judgment on all claims asserted against it by Abney. In its motion, it also asserted that Abney had failed to pursue her second cause of action alleging negligence in the design, manufacture, and/or sale of the gun. Crosman also asserted that Alabama law prevented Abney from pursuing her fourth cause of action alleging breach of express or implied warranties. Abney did not challenge either of these assertions in her response to Crosman's motion, and she does not challenge them on appeal.
On April 5, 2004, Owens moved for a summary judgment, relying on all pleadings and evidence contained in the record, and adopting by reference Crosman's memorandum of law in support of its own motion for a summary judgment. Although the trial court originally denied Owens's motion as untimely, it later withdrew the order denying the motion on that basis, after determining that Abney and Owens had agreed to an extension of the time to file Owens's motion.
On April 14, 2004, the trial court conducted a hearing on the summary-judgment motions. During the hearing, the trial court noted that, regardless of Rabb's testimony as to her subjective lack of knowledge that the gun was lethal, she had nevertheless told her children that the gun could kill someone. The court also noted that Rabb had locked the gun in the trunk of her car and that Plezarius had picked the lock to get the gun. The trial court found first, that the danger presented by the gun was open and obvious, and second, "that the gun was locked away, the child jimmied a lock to get the gun, the child had been told the gun would kill people," and thus "[e]verything that the warnings would have sought to accomplish was accomplished." The court therefore also found no proximate cause between the alleged failure to warn and Sacorya's death. As a result, the trial court entered a summary judgment for both Crosman and Owens. Abney appeals.
 Standard of Review "`In reviewing the disposition of a motion for summary judgment, "we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine *Page 293 
issue of material fact," Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was "entitled to a judgment as a matter of law." Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Wright, 654 So.2d at 543
(quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990).'"
Bagley v. Creekside Motors, Inc., 913 So.2d 441, 443-44 (Ala. 2005) (quoting Hobson v. American Cast Iron Pipe Co.,690 So.2d 341, 344 (Ala. 1997)).
 Analysis
Abney's appeal raises only two issues: (1) whether the defendants are to be held liable for the negligence of each in failing to warn Rabb, and (2) whether the defendants are to be held strictly liable under the AEMLD.[1]
Abney argues that the defendants negligently failed to warn Rabb of the danger of the gun. Liability for one's negligent failure to warn a user of the dangers of a product arises underRestatement (Second) of Torts § 388 (1965), as adopted by this Court. See Purvis v. PPG Indus., Inc., 502 So.2d 714, 719 (Ala. 1987). Section 388 provides:
 "One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
 "(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
 "(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
 "(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."
Section 388 sets forth a supplier's duty to exercise care in placing products in the market. Ex parte Chevron Chem. Co.,720 So.2d 922, 924 (Ala. 1998). This duty is owed not only to those whom the supplier "should expect to use" the product, but also to those who are "endangered by its probable use." Restatement(Second) of Torts § 388. Although failure-to-warn cases have traditionally been brought against the supplier by a person injured by his or her own use of the product, in this case we are presented with the somewhat *Page 294 
novel legal theory — that the plaintiff may be someone other than the user of the product. The language of § 388, however, allows a plaintiff to travel upon such a theory in a negligence action.
Abney first argues that the trial court erred because, contrary to the court's findings at the hearing on the summary-judgment motion, the particular danger presented by the gun was not "open and obvious"; therefore, she argues the defendants had a duty to warn Rabb that the gun had the capability of killing a person. Abney points particularly to the fact that some air rifles have the capacity to kill a person, while others do not. She also cites cases in support of the argument that conflicting evidence on this issue warrants submission of the question to a jury, thus precluding a summary judgment. The defendants argue that the danger presented by an air rifle is open and obvious as a matter of law, and they cite cases, primarily from other jurisdictions, in which courts have so held.
The duty to warn expressed in § 388(c) is "triggered only when the supplier has `no reason to believe' that the user will realize the `dangerous condition' of the product referred to in § 388(b)." Ex parte Chevron Chem., 720 So.2d at 925. In other words, "[t]he objective of placing a duty to warn on the manufacturer [or supplier] of a product is to acquaint the user with a danger of which he is not aware, and there is no duty to warn when the danger is obvious." Gurley v. American Honda MotorCo., 505 So.2d 358, 361 (Ala. 1987) (citing Ford Motor Co. v.Rodgers, 337 So.2d 736, 739 (Ala. 1976)). A critical issue, yet one not addressed by either party, is whether the openness and obviousness of a particular danger is to be evaluated from the objective perspective of a "reasonable person" or from the subjective perspective of the particular plaintiff.
In 1976, this Court adopted the open-and-obvious defense as it applies in a products-liability action alleging negligent failure to warn. See Rodgers, 337 So.2d at 739. In Rodgers, although the jury clearly concluded that the danger presented by the product at issue there was not open and obvious, as evidenced by a verdict for the plaintiff, we stated that the jury in evaluating the negligent-failure-to-warn claim could have considered
 "whether the injured person had any special experience involving the condition from which he was injured, whether it would be commonly known that such a condition was dangerous, whether the danger should have been obvious to the injured person, and finally, whether the user had knowledge of the danger and appreciated it."
337 So.2d at 740. Of these four "factors," two appear to embrace a "subjective" inquiry — whether the particular plaintiff knew of the danger — and two implicate an objective inquiry of the openness and obviousness of the danger. Rodgers then does not seem to suggest one particular perspective from which to determine the issue whether the danger was open and obvious.
Since Rodgers, however, the vast majority of cases have focused upon the particular plaintiff's subjective knowledge of the danger. See Mathis v. Harrell Co., 828 So.2d 248, 257 (Ala. 2002) (concluding that "in this case, the facts do not establish that there was an open and obvious danger. . . . [T]here is testimony that [the plaintiff] was hurried and that he did not know, understand, and appreciate the danger."); Rowden v.Tomlinson, 538 So.2d 15, 18 (Ala. 1988) (concluding that "[t]he evidence shows that the rotating auger blades were open and obvious to Rowden's view and that he knew, understood, and appreciated their danger"); Hawkins v. Montgomery Indus. Int'l,Inc., 536 So.2d 922, 926-27 *Page 295 
(Ala. 1988) (concluding that a defendant had no duty to warn of a danger because the evidence indicated that all parties were aware of it); Entrekin v. Atlantic Richfield Co., 519 So.2d 447, 450
n. 5 (1987) (concluding that a defendant had no duty to warn because the plaintiff knew of the danger posed by a product); andGurley v. American Honda Motor Co., 505 So.2d at 360
(concluding that defendant had no duty to warn because the plaintiff "had read and understood the warnings" and had even informed a friend that the product — a motorcycle — was not built for two people). But see Ex parte Chevron Chem.,720 So.2d at 926-27 (concluding that a defendant did not have a duty to warn of a danger of which plaintiffs "already were, or had reason to be, aware"); Halsey v. A.B. Chance Co., 695 So.2d 607, 610-11
(Ala. 1997) (concluding that a plaintiff had presented substantial evidence indicating that a danger was not open and obvious because "someone" could foreseeably make the mistake made by plaintiff's decedent).
This Court's reliance upon one's subjective knowledge suggests that it has historically viewed the open-and-obvious defense as a concept that evolved from the affirmative defense of assumption of the risk. The fact that we treat the open-and-obvious defenseas an affirmative defense in AEMLD cases, see Atkins v.American Motors Corp., 335 So.2d 134, 143 (Ala. 1976), but as obviating the defendant's duty in a negligence case, seeRodgers, 337 So.2d at 739, is perhaps the manifestation of a logical inconsistency. Yet because no party here has argued that we should reverse course, we need not reevaluate the wisdom of determining the openness and obviousness of a danger based on the subjective perspective of the user.
Negligent-failure-to-warn cases have also historically examined the openness and obviousness of a danger from the vantage point of the "person for whose use [the product] is supplied,"Restatement § 388. In this case, the gun was supplied for Plezarius's use; thus, we would normally evaluate his subjective knowledge. As summarized in the facts above, the evidence, even when viewed in the light most favorable to Abney, establishes that Plezarius was well aware of the dangerousness of the gun and, in fact, of its lethal potential. He testified that he was fully aware that the gun had the capacity to kill a person. Thus evaluating the subjective knowledge held by Plezarius, we conclude that the danger presented by the gun was open and obvious.
Abney, however, has focused her argument upon the knowledge, or lack thereof, of Rabb, the purchaser of the gun. We find that even if Rabb's knowledge, or lack thereof, is considered, Abney still cannot prevail. Although at more than one point Rabb testified that she did not know that the gun had a lethal capacity and that she would not have purchased it had she known that, the undisputed testimony from Jervomie, Shameka, and D'Antonio establishes that she declared in the presence of each of them and of Plezarius that the gun could kill a person. Abney has not contradicted that evidence by affidavits or through other deposition testimony. Rabb was never asked about it. In evaluating a summary judgment, we seek to determine whether there is a "genuine issue of material fact"; we conclude that Rabb's testimony of her subjective knowledge — i.e., that she was not aware the gun could kill someone — is completely overwhelmed by the uncontradicted testimony of three of her children. These statements by the children that she informed them of the gun's lethal capacity indicates that she consciously appreciated the danger posed by the gun. To tell the children that the gun could kill a person, she had to mentally *Page 296 
conceive that possibility, and the warning she gave her sons paralleled the warning about the lethality of the gun that Abney says Rabb should have received from the defendants. Obviously, that warning would not have given Rabb information she did not already possess; otherwise, she could not have verbalized it to her children, a fact that stands conclusively established under the evidence. Thus, her statements accomplished the very purpose that would have been accomplished by a warning, had it reached her or her children. We conclude that the danger presented by the gun, specifically its capacity to inflict a lethal injury upon a human being, was open and obvious to Rabb.
Because the danger presented by the gun was obvious to Rabb, the purchaser, and to Plezarius, the user, we hold that neither Crosman nor Owens had any duty to warn of the danger posed by the gun. Additionally, as in Ex parte Chevron Chemical,720 So.2d at 929, "for the same reason that [the defendants] ha[ve] no legal duty to warn [Plezarius] under pure negligence principles, [they have] a complete affirmative defense under the AEMLD." We therefore pretermit all remaining issues.
 Conclusion
Because both Plezarius, the user of the gun, and Rabb, the consumer who purchased the gun, were aware that the gun could kill a person, we conclude that the dangers presented by the gun were open and obvious to them, and, therefore, that the defendants had no duty to warn Plezarius or Rabb of that of which they already knew. Therefore, as to Abney's negligence and wantonness claims, we affirm the trial court's summary judgment for the defendants. Because the Defendants were relieved of their duty to warn under negligence principles by the actual knowledge of Plezarius and Rabb, they have a complete affirmative defense under the AEMLD.
AFFIRMED.
NABERS, C.J., and SEE, STUART, and BOLIN, JJ., concur.
[1] Abney has not appealed the summary judgment for Owens on her claim alleging negligent and/or wanton supervision.